WILSON ELSER
WILSON ELSER MOSKOWITZ EDELMAN & DICKER LLP

July 22, 2026

**Thomas A. Gentile, Esq.**
973.735.5785 (direct)
thomas.gentile@wilsonelser.com

**VIA ELECTRONIC FILING**

Patricia S. Dodszuweit, Clerk
United States Court of Appeals for the Third Circuit
21400 U.S. Courthouse
601 Market Street
Philadelphia, Pennsylvania 19106-1790

Re: *Celebrity of Springfield LLC v. SBA*, No. 25-2026
(Oral Argument: Sept. 17, 2026)

Dear Ms. Dodszuweit:

Pursuant to FRAP 28(j), I write promptly in response to the Government's submission of July 17, 2026, which called to this Court's attention the Seventh Circuit's recent decision in *Oak Lawn Respiratory & Rehabilitation Center, LLC v. SBA*, No. 25-1346 (July 14, 2026).

*Oak Lawn* addressed whether the SBA acted properly when it originally promulgated the corporate group rule. *Oak Lawn* is inapplicable because this appeal presents a very different question: what happens when a loan results in a group maximum being exceeded? The SBA says that it acted properly when it denied forgiveness as to the entirety of the loan that resulted in Celebrity's corporate group maximum being exceeded. Appellant maintains that the SBA should have denied forgiveness *only* as to the portion of that loan that exceeded the group maximum, while granting forgiveness as to the portion that was not in excess. *Oak Lawn* says absolutely nothing about this question of partial forgiveness.

The government casts *Oak Lawn* as "emphasiz[ing] that the statutory scheme gives the SBA a good deal of administrative discretion." Doc 49 at 2 (internal punctuation omitted). The Government attempts to link such general statements in *Oak Lawn* to this appeal's issue of partial forgiveness. Yet under *Loper Bright* (which *Oak Lawn* nowhere mentions), the CARES Act's various grants of authority to the SBA *do not* empower the SBA to adopt unreasonable interpretations in situations in which the statute itself is ambiguous.

This is demonstrated by the U.S. Court of Federal Claims' recent decision in *Keysight Techs., Inc. v. United States*, No. 25-cv-00137 (July 2, 2026) (attached), which Appellant now calls to this Court's attention pursuant to FRAP 28(j). *Keysight* held that a statute's grant to an agency of "broad authority to prescribe regulations" does not allow the agency to define ambiguous terms, "untethered to congressional grants of authority or the underlying statutory context," because doing so is "precisely the kind of agency overreach that *Loper Bright* was designed to foreclose." Similarly here, the SBA's unreasonable denial of partial forgiveness has no basis in the text of the CARES Act, and therefore must be overturned.

Respectfully submitted,

**WILSON ELSER MOSKOWITZ EDELMAN & DICKER LLP**

By: /s/ Thomas A. Gentile
THOMAS A. GENTILE

Thomas A. Gentile, Esq.
*An Attorney Admitted to Practice before this Honorable Court*

7 Giralda Farms
Madison, New Jersey 07940
Phone: (973) 735-5785

*Counsel for Plaintiff-Appellant*
Celebrity of Springfield, LLC

# In the United States Court of Federal Claims

No. 25-137
Filed: July 2, 2026

**KEYSIGHT TECHNOLOGIES, INC. & SUBSIDIARIES,**

***Plaintiff*,**

**v.**

**THE UNITED STATES,**

***Defendant*.**

*Jenny A. Austin*, with *Gary B. Wilcox*, *Nicole A. Saharsky*, *Anthony D. Pastore*, *Maria C. Critelli*, *Minh Nguyen-Dang*, *Graham White*, *Zachary C. Weit*, *Madison T. Zeeman*, Of Counsel, Mayer Brown LLP, Chicago, IL, for the Plaintiff.

*Kari Madrene Larson*, Senior Litigation Counsel, *Eric J. Smith*, *Elisabeth K. Kryska*, *Jeremy A. Rill*, Trial Attorneys, Tax Litigation Branch, Civil Division, with *Jason Bergmann*, Assistant Director, *Joshua Wu*, Deputy Assistant Attorney General, Tax Litigation Branch, and *Brett A. Schumate*, Assistant Attorney General, U.S. Department of Justice, Washington, DC, for the Defendant.

## MEMORANDUM ORDER AND OPINION

**TAPP, Judge.**

When *Chevron* fell, so too did the presumption that statutory ambiguity favors the agency. *Chevron U.S.A., Inc. v. Natural Resources Defense Council, Inc.*, 467 U.S. 837 (1984), *overruled by Loper Bright Enterprises v. Raimondo*, 603 U.S. 369 (2024). *Loper Bright* unambiguously reassigned interpretive authority to the courts but left largely unresolved the methodological question of how that authority is to be exercised. *See Loper Bright*, 603 U.S. at 369. The Court now grapples with that question in resolving the cross-motions before it. Both parties in this matter move for summary judgment based on the same Treasury regulation but present diverging theories of post-*Chevron* statutory interpretation. The Court finds that Congress did not confer discretion to the Treasury to interpret the underlying statute. Therefore, the United States' Cross-Motion for Summary Judgment is **DENIED**, (ECF No. 40), and Plaintiff's Partial Motion for Summary Judgment is **GRANTED**, (ECF No. 34).

## I. Background

This controversy relates to the Treasury's self-inflicted fix of a mismatch between foreign subsidiaries with fiscal- or calendar-year tax filing requirements that Congress quietly built into the global intangible low-taxed income ("GILTI") statutory scheme. Plaintiff, Keysight Technologies, Inc. & Subsidiaries ("Keysight"), is a "multinational technology company that helps enterprises, service providers, and governments accelerate innovation to connect and secure the world by providing electronic design and test solutions that are used in the simulation, design, validation, manufacture, installation, optimization, and secure operation of electronics systems in the communications, networking, and electronics industries." (Compl. at ¶ 24, ECF No. 1). Three of Keysight's subsidiaries are organized in Singapore and one in Delaware. (*Id.* at ¶ 7). Keysight alleges that the United States failed to grant its refund claims for the 2020, 2021, and 2022 tax years. (*Id.* at ¶ 14). Specifically, Keysight argues that it "is entitled to an amortization deduction under section 197 of the Internal Revenue Code when computing its [GILTI] inclusion under section 951A." (*Id.* at ¶ 1 (referring to I.R.C. § 951A)). Historically, United States companies generally did not pay tax on the earnings of their foreign subsidiaries until those earnings were returned to the United States. *See* MARK P. KEIGHTLEY, CONG. RSCH. SERV., R41852 U.S. INTERNATIONAL CORPORATE TAXATION: BASIC CONCEPTS AND POLICY ISSUES 2 (2016) (describing the prior law deferral regime). Congress fundamentally altered that deferral approach in the Tax Cuts and Jobs Act of 2017 ("TCJA"). Pub. L. No. 115-97, 131 Stat. 2054; *see also Moore v. United States*, 602 U.S. 572, 580 (2024) (describing the TCJA as a "complicated transition to a more territorial system."). Among its many reforms, the TCJA created a new category of taxable income—GILTI—that is taxed in the year it is earned, even if the income is not repatriated to the United States. *See* Pub. L. No. 115-97, § 14201(d), 131 Stat. 2054, 2213. Enactment of the TCJA created an inconsistency between treatment of certain taxpayers depending on whether they were fiscal-year or calendar-year filers.

The Treasury's antipathy for this inconsistency resulted in the Secretary promulgating Regulation 1.951A-2(c)(5) ("the Regulation"). According to the United States, the primary purpose of the Regulation was to keep affected taxpayers from "gam[ing] the new rules" by transferring assets from one related controlled foreign corporation ("CFC") to another during the "disqualified period[.]" (Def.'s Cross-Mot. at 11, ECF No. 40). As a result of the Regulation, deductions or losses attributable to non-taxable gap period transactions are not "properly allocable" to income taxed under GILTI and are therefore not available to reduce income that is subject to United States tax. Treas. Reg. § 1.951A-2(c)(5)(i), (ii); I.R.C. § 951A(c)(2)(A)(ii)[1]. Keysight argues that it would be entitled to a Section 197 amortization deduction when computing its GILTI inclusion if the Regulation had never been promulgated. (Compl. at ¶ 2). Keysight now challenges the validity of the Regulation itself, arguing that it: contradicts the promulgating statute; exceeds the Treasury's authority; and is not a logical outgrowth of the proposed rule in violation of the Administrative Procedure Act ("APA"). (Pl.'s Mot. at 13–40, ECF No. 34). For these reasons, Keysight argues that it is entitled to partial summary judgment. (*Id.*).

---

[1] Unless otherwise specified, all citations to the Internal Revenue Code are to the years at issue.

Conversely, the United States argues that companies with foreign subsidiaries that file their taxes on a fiscal-year basis (like Keysight) received an unwarranted benefit from the effective date Congress chose for GILTI, so it properly denied some of their deductions via the Regulation. (*See* Def.'s Cross-Mot. at 1–3). The United States claims that the Treasury has broad authority under I.R.C. § 7805(a) to prescribe all "needful rules and regulations" and that Congress delegated authority to the Secretary under I.R.C. § 951A(c)(2)(A)(ii) to define what deductions are "properly allocable" to a CFC's gross income. (*Id.* at 14–22). The United States also argues that the Regulation is a logical outgrowth of the proposed regulation because they serve the same logical function of preventing taxpayers from benefiting from deductions attributable to disqualified bases. (*Id.* at 42). Accordingly, the United States seeks full summary judgment in its favor. (*Id.* at 3).

These facts give rise to the issue presented here: was the Treasury permitted to remedy the congressionally created distinction between fiscal-year and calendar-year filers which benefited Keysight and similarly situated domestic companies that controlled foreign corporation subsidiaries? The answer: it was not.

## II. Analysis

### *A. Standard of Review*

This Court's jurisdiction is generally delimited by the Tucker Act, 28 U.S.C. § 1491. The Tucker Act grants this Court jurisdiction over claims: (1) founded on an express or implied contract with the United States; (2) seeking a refund for a payment made to the government; and (3) arising from federal constitutional, statutory, or regulatory law mandating payment of money damages by the United States. 28 U.S.C. § 1491(a)(1). However, the Tucker Act "does not [itself] create a substantive cause of action; in order to come within the jurisdictional reach and the waiver of the Tucker Act, a plaintiff must identify a separate source of substantive law that creates the right to money damages." *Fisher v. United States*, 402 F.3d 1167, 1172 (Fed. Cir. 2005). Once the Court's jurisdiction is established, it may resolve all issues of law and fact necessary to adjudicate the claim, including questions of statutory interpretation. *Id.* The Court does not frequently have the occasion to resolve pure questions of statutory interpretation, but the current controversy provides a prime occasion to do so.[2]

Pursuant to the Tucker Act, the Court reviews agency actions and decisions under the judicial-review standards of the APA. 28 U.S.C. § 1491(b)(4). Under the APA, a court should "hold unlawful and set aside" an agency's regulation if the court determines that the regulation is "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law;" is "in excess of statutory jurisdiction, authority, or limitations[;]" or was enacted "without observance

---

[2] The Court may grant summary judgment if the pleadings, affidavits, and evidentiary materials filed in a case reveal that "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." RCFC 56(a). Neither party presents any contested facts in their respective motions. (*See* Pl.'s Mot., ECF No. 34; Def.'s Cross-Mot., ECF No. 40). The Court is therefore proceeding with this analysis exclusively as a question of law.

of procedure required by law[.]" 5 U.S.C. § 706(2)(A), (C), (D). A regulation that is contrary to the statute is, by definition, not in accordance with law, and in excess of statutory authority—and thus invalid. *GHS Health Maint. Org., Inc. v. United States*, 536 F.3d 1293, 1297 (Fed. Cir. 2008) (citing *Ragsdale v. Wolverine World Wide, Inc.*, 535 U.S. 81, 86 (1997)).

In reviewing an agency's regulation, a "court shall decide all relevant questions of law, interpret constitutional and statutory provisions, and determine the meaning or applicability of the terms of an agency action." 5 U.S.C. § 706. "Statutory interpretation begins with the words of the statute." *ITServe All., Inc. v. United States*, 161 Fed. Cl. 276, 283 (2022), *aff'd*, 122 F.4th 1364 (Fed. Cir. 2024) (quoting *BASR P'ship v. United States*, 795 F.3d 1338, 1342 (Fed. Cir. 2015)). The Court should "determine whether the language at issue has a plain and unambiguous meaning with regard to the particular dispute in the case*." Robinson v. Shell Oil Co.*, 519 U.S. 337, 340 (1997). If the statutory text is unambiguous, "the inquiry ends," and "the Court must not go 'beyond the borders of the statute.'" *ITServe All.*, 161 Fed. Cl. at 284 (quoting *United States v. Great N. Ry. Co.*, 287 U.S. 144, 154 (1932)).

In *Loper Bright*, the Supreme Court explained that courts have the final word on the meaning of statutes, and that agency interpretations of statutes "are not entitled to deference[.]" 603 U.S. at 371–72, 396–97. However, *Loper Bright* did not eliminate the Court's interpretive arsenal. For example, *Skidmore v. Swift Co.*, remains helpful in statutory analysis.[3] 323 U.S. 134 (1944). *Loper Bright* specified that courts may "seek aid from the interpretations of those responsible for implementing particular statutes. Such interpretations 'constitute a body of experience and informed judgment to which courts and litigants may properly resort for guidance.'" 603 U.S. at 394 (quoting *Skidmore*, 323 U.S. at 140). The weight of these interpretations "depend[s] upon the thoroughness evident in its consideration, the validity of its reasoning, its consistency with earlier and later pronouncements, and all those factors which give it power to persuade, if lacking power to control." *Id.* at 370 (quoting *Skidmore*, 323 U.S. at 140). This "power to persuade" is especially informative "to the extent it rests on factual premises within [the agency's] expertise." *Id.* at 374 (quoting *Bureau of Alcohol, Tobacco & Firearms v. FLRA*, 464 U.S. 89, 98 n.8 (1983)). However, the Court is the final arbiter and interpreter of statutes, particularly when they are ambiguous. *See id.* at 373–74.

### *B. Statutory and Regulatory Foundation*

Keysight and the United States ground their arguments in an array of sources. The Court sets forth the most relevant below. The Treasury Regulation at issue is 1.951A-2(c)(5):

---

[3] Scholars suggest that courts work older interpretative approaches into their post-*Chevron* analyses of tax regulations. *See* Blaine G. Saito, *Tax Regulations in A Loper Bright Light*, 28 FLA. TAX REV. 530, 534 (2025) ("[T]he general grant of regulatory authority will create a standard that sounds similar to the old *National Muffler* test and a *Skidmore* overlay . . . specific grants should provide greater leeway to the Treasury.") (referring to *National Muffler Dealers Ass'n v. United States*, 440 U.S. 472 (1979); Amandeep S. Grewal, *Tax Regulations After Loper Bright*, 2024 MICH. ST. L. REV. 1083, 1087–91, 1096–98 (2024) (discussing the standard set by *National Muffler* and its relationship to tax exceptionalism after *Loper Bright*).

> (5) Allocation of deduction or loss attributable to disqualified basis—(i) In general. A deduction or loss attributable to disqualified basis is allocated and apportioned solely to residual CFC gross income, and any depreciation, amortization, or cost recovery allowances attributable to disqualified basis is not properly allocable to property produced or acquired for resale under section 263, 263A, or 471.
>
> (ii) Determination of deduction or loss attributable to disqualified basis. Except as otherwise provided in this paragraph (c)(5)(ii), in the case of a depreciation or amortization deduction with respect to property with disqualified basis and adjusted basis other than disqualified basis, the deduction or loss is treated as attributable to the disqualified basis in the same proportion that the disqualified basis bears to the total adjusted basis in the property. In the case of a loss from a taxable sale or exchange of property with disqualified basis and adjusted basis other than disqualified basis, the loss is treated as attributable to disqualified basis to the extent thereof.
>
> (iii) Definitions. The following definitions apply for purposes of this paragraph (c)(5).
>
>> (A) Disqualified basis. The term disqualified basis has the meaning set forth in § 1.951A–3(h)(2)(ii).
>>
>> (B) Residual CFC gross income. The term residual CFC gross income means gross income other than gross tested income, gross income taken into account in determining subpart F income, or gross income that is effectively connected, or treated as effectively connected, with the conduct of a trade or business in the United States (as described in § 1.882–4(a)(1)).
>
> (iv) Reductions to disqualified basis pursuant to coordination rules. See § 1.245A–7(b) or § 1.245A–8(b), as applicable, for reductions to disqualified basis resulting from the application of § 1.245A–5.
>
> [. . .]

Treas. Reg. § 1.951A-2(c)(5) (2022) (omitting text containing examples).

The United States cites multiple sources of authority for the promulgation of this Regulation. First, I.R.C. § 7805(a), which invokes a broad grant of authority to the Secretary:

> (a) Authorization.--Except where such authority is expressly given by this title to any person other than an officer or employee of the Treasury Department, the Secretary shall prescribe all needful rules and regulations for the enforcement of this title, including all rules and regulations as may be necessary by reason of any alteration of law in relation to internal revenue.

(*See* Def.'s Cross-Mot. at 9, 13, 18–22, 30–32, 36, 38). Second, the United States relies on I.R.C. § 954(b)(5), which states:

> (5) Deductions to be taken into account.--For purposes of subsection (a), the foreign personal holding company income, the foreign base company sales income, and the foreign base company services income shall be reduced, under regulations prescribed by the Secretary, so as to take into account deductions (including taxes) properly allocable to such income. Except to the extent provided in regulations prescribed by the Secretary, any interest which is paid or accrued by the controlled foreign corporation to any United States shareholder in such corporation (or any controlled foreign corporation related to such a shareholder) shall be allocated first to foreign personal holding company income which is passive income (within the meaning of section 904(d)(2)) of such corporation to the extent thereof. The Secretary may, by regulations, provide that the preceding sentence shall apply also to interest paid or accrued to other persons.

(*See* Def.'s Cross-Mot. at 15, 28). And third, the United States relies on I.R.C. § 951A(c)(2)(A)(ii), which defines "tested income" as "the excess (if any) of . . . (ii) the deductions (including taxes) properly allocable to such gross income under rules similar to the rules of section 954(b)(5) (or to which such deductions would be allocable if there were such gross income)." (*See* Def.'s Cross-Mot. at 5, 10, 12, 14–18, 20–25, 27, 29, 32, 36–39). Keysight cites an additional Treasury Regulation as the source of the historic definition of the term "properly allocable[.]" (*See* Pl.'s Mot. at 15 (citing Treas. Reg. § 1.954-1(c)(1)(i)(B) ("Second, any expenses definitely related to less than all gross income as a class shall be allocated and apportioned under the principles of sections 861, 864 and 904(d) to the gross income described in paragraph (c)(1)(i)(A) of this section."))). It is within this statutory and regulatory landscape that the Court grounds its analysis.

### *C. Promulgating Authority*

The general grant of authority in Section 7805(a), standing alone, is insufficient to supply the requisite authority to the Secretary. The United States argues that even post-*Chevron*, statutes like Section 7805(a) are best read as broad delegations of authority that allow an agency to issue regulations to ensure application of the law matches Congress's unexpressed intent. (Def.'s Cross-Mot. at 19 (citing *Lesko v. United States*, 161 F.4th 1352 (Fed. Cir. 2025))).[4] To follow

---

[4] Interestingly, Keysight maintains that the government's argument that Section 951A(c)(2)(A)(ii) itself gives the Treasury Department authority to define "properly allocable" differently from the factual relationship test was "made for litigation" because the Treasury Department did not rely on 951A(c)(2)(A)(ii) in promulgating the Regulation. (Pl.'s Resp. at 15, ECF No. 42). The statute does not even mention the Secretary, and the United States misuses *Lesko* because the regulation in *Lesko* involved a statute that was genuinely silent on the relevant

the United States' logic to its conclusion and find that Section 7805(a) grants the Secretary unfettered discretion to not only prescribe "needful rules" but to also define when rules are and are not "needful" would invalidate *Loper Bright* itself. The Court declines to cross a bridge the law does not build. As Keysight points out, these broad grants of Agency rulemaking authority permeate the United States Code. (*See* Pl.'s Resp. at 16). Under the Treasury's view, an agency's mere disagreement with the scope of congressional action suffices to justify restructuring federal law to its own liking. If Section 7805(a) is in fact some kind of *Loper Bright* exception, then virtually every agency regulation would be presumptively valid, rendering *Loper Bright* meaningless. Furthermore, if Section 7805(a) broadly delegates authority to promulgate binding substantive tax regulations whenever the Treasury Department deems them "needful," then there would be no reason for Congress to expressly authorize substantive rulemaking elsewhere in the United States Code. Yet Congress has done so many times. *See, e.g.*, I.R.C. §§ 245A(g), 951A(d)(4).

Therefore, the Court finds that alone, Section 7805(a) does not give the Secretary the power to promulgate regulations in every case. It would, however, conceivably grant the Secretary authority to issue regulations in conjunction with a *specific* grant of authority. For example, in the proposed rule, the Treasury relied principally on its anti-abuse authority under Section 951A(d)(4), and in the final rule, the Treasury rested almost entirely on its general rulemaking authority under Section 7805(a). *See* Guidance Related to Section 951A, 83 Fed. Reg. 51072-01, 51077 (Oct. 10, 2018) (proposed rule); 84 Fed. Reg. 29288-01, 29298–99 (June 21, 2019) (final rule). Subsection 951A(d)(4) notes that "[t]he Secretary shall issue such regulations or other guidance as the Secretary determines appropriate to prevent the avoidance of the purposes of this subsection . . . ." However, "this subsection" refers to Section 951A(d), which encompasses rules about qualified business asset investment ("QBAI").[5] GILTI is a separate subsection entirely. *See* § 951A(c)(2)(A)(ii). As Keysight notes, subsequent legislative action can be informative of Congressional intent. (Pl.'s Mot. at 32 (citing the failed Build Back Better Act of 2021, H.R. 5376, 117th Cong., § 138110, for the premise that Congress had an opportunity to change the language of Section 951(A)(d) to "section" rather than "subsection" but did not.)).

Pursuing another angle, the United States argues that "Section 7805(a), in conjunction with Section 951A(c)(2)(A)(ii), gives the Secretary broad discretion to fill in gaps or make any necessary rules resulting from the TCJA's sweeping changes." (Def.'s Cross-Mot. at 18). In principle, the Court agrees—if Section 951A(c)(2)(A)(ii) specifically granted authority to the

---

issue—as opposed to here where the statute is not silent. *See Lesko v. United States*, 161 F.4th 1352 (Fed. Cir. 2025). *Lesko* also involved a purely procedural requirement governing the *form* of approval for overtime. Pl.'s Resp. at 19; *see Lesko*, 161 F.4th at 1352.

[5] "[QBAI] means, with respect to any controlled foreign corporation for any taxable year, the average of such corporation's aggregate adjusted bases as of the close of each quarter of such taxable year in specified tangible property—(A) used in a trade or business of the corporation, and (B) of a type with respect to which a deduction is allowable under section 167." I.R.C. 951A(d)(1).

Secretary to promulgate the Regulation, it would likely be sufficient, coupled with the Secretary's broader power under Section 7805(a). However, Section 951A(c)(2)(A)(ii) does not grant the Treasury specific authority, neither expressly nor impliedly. The statute is altogether ambiguous. In other parts of Section 951A there are some express delegations of authority to the Secretary, such as "[t]he Secretary shall issue such regulations or other guidance as the Secretary determines appropriate to prevent the avoidance of the purposes of this subsection," but those express grants are limited to specific subsections and even more specific conditions. § 951A(d)(4); *see also* § 951A(f)(1)(B) ("The Secretary shall provide rules for the application of subparagraph (A) to other provisions of this title in any case in which the determination of subpart F income is required to be made at the level of the controlled foreign corporation."). The subsection at issue here, Section 951A(c), does not reference the Secretary at all. Generally, "the silence of Congress" is "a treacherous guide to its intent." *Watt v. Alaska*, 451 U.S. 259, 271 n.13 (1981); *see also Scripps-Howard Radio, Inc. v. FCC*, 316 U.S. 4, 11 (1942) ("The search for significance in the silence of Congress is too often the pursuit of a mirage."). Even still, the Court finds it curious that Congress expressly delegated authority to the Secretary to promulgate regulations with regard to some subsections but not others.

Without language granting authority to the Secretary within the four corners of Section 951A(c), the Court must venture deeper into the realm of statutory construction and the interpretive ambiguities left behind by *Loper Bright*. Here, the United States asks that the Court rely on the *Loper Bright* instruction "that sometimes 'the best reading of a statute is that it delegates discretionary authority to an agency.'" (Def.'s Cross-Mot. at 14 (quoting *Loper Bright*, 603 U.S. at 395)). Specifically, the United States contends that the "best reading" of Section 951A(c) grants the Secretary authority to issue regulations that determine how to properly allocate deductions to a CFC's gross tested income. (*Id.*). The United States bases its authority for this argument in the phrase "rules similar to the rules of section 954(b)(5)[,]" arguing that this was Congress *expressly* permitting the Treasury to define "properly allocable" in regulation because Section 954(b)(5) states that certain income should be reduced "under regulations prescribed by the Secretary, so as to take into account deductions (including taxes) properly allocable to such income." (Def.'s Cross-Mot. at 15). The Court reads the Tax Code more narrowly. Section 954(b)(5) only grants the Treasury the authority to promulgate regulations "[f]or purposes of subsection (a)," which in turn describes foreign base company income, not GILTI. *See* § 954(a).

The final rule guidance references Section 954(b)(5) under the "Authority" section: "Section 954(b)(5) provides that [foreign personal holding company income], foreign base company sales income, and foreign base company services income are reduced, 'under regulations prescribed by the Secretary,' by deductions 'properly allocable' to such income." 84 Fed. Reg. at 29299. The rule guidance goes on to state:

> The rule, as revised in the final regulations, provides guidance for determining whether certain deductions or losses are "properly allocable" to gross tested income, subpart F income, or effectively connected income within the meaning of section 951A(c)(2)(A), section 954(b)(5), or section 882(c)(1)(A), respectively. *See*, for example, *Redlark v. Commissioner*, 141 F.3d 936, 940–41 (9th Cir. 1998) and *Miller v. United States*, 65 F.3d 687,

> 690 (8th Cir. 1995) (determining that the term "properly allocable" in section 163(e) is ambiguous and therefore there is an implicit legislative delegation of authority to the Commissioner to define the term).

84 Fed. Reg. at 29299. This appears to be an over-extension of the Treasury's statutory authority, of which the Court can find none other than the overly broad Section 7805(a).

In addition, the United States contends that even without an express grant of authority, a regulation may still be valid if it "is reasonably related to the purposes of the enabling legislation." (Def.'s Cross-Mot. at 31 (citing *Mourning v. Fam. Publications Serv., Inc.*, 411 U.S. 356, 369 (1973))). The United States argues that the Regulation "prevent[s] an abusive result" and is therefore "reasonably related to the 'enforcement' of the Code." (*Id.* at 31–32 (citing I.R.C. § 7805(a)). In doing so, it makes a logical, but ultimately unsupported argument. (*See id.* at 31 ("Without regulations providing rules for the proper allocation of expenses to categories of income, taxpayers would be left with uncertainty, and the enforcement of the Code would suffer from inconsistent positions taken by taxpayers.")). The Treasury's concern about taxpayer uncertainty, while laudable, is not supported by the developed record; to the contrary, the Treasury's concern is principally with lost revenue. (*See* Hearing Transcript ("Hr'g Tr.") at 50:12–18 (Def.'s Counsel: "If you rule in our favor, not only would Keysight not be able to claim the $500 million in amortization deductions for each of the three years, Keysight's intending to make that same claim through 2033. So we're talking upwards possibly of $500 million.") (cleaned up), ECF No. 50). Whether the outcome of litigation financially benefits one party over the other, even when one of the parties is the Department of Treasury, is not the Court's concern. Moreover, the United States cites no additional support for this argument other than Section 7805(a), which the Court has found to be insufficient to confer authority, and contrary to common sense.[6]

Finding no express or implied grant of authority in the plain language of the cited statutes, the Court turns next to the legislative history of Section 951A-2(c)(5) for evidence of congressional intent. Defendant cites to a House of Representatives Conference Report on the Tax Reform Act of 1986 to support the premise that Congress was interested in curbing abusive transactions. (Def.'s Cross-Mot. at 28 (citing H.R. Rep. No. 99-841, pt. II, at 578–79 (1986) (Conf. Rep.))). Committee reports do not necessarily reflect the intent of the *entire* Congress at the time legislation is actually enacted and thus have only limited persuasive value. Moreover, if Keysight acted within the bounds of the statute as Congress chose to enact it, characterizing Keysight's statutorily authorized conduct as "abusive" is simply incorrect. (*See id.*). While The Treasury did expressly rely on a small portion of a 2017 Conference Report as support for the

---

[6] The United States urges that "[t]here is no indication that Congress intended a massive tax holiday during which only taxpayers with fiscal-year CFCs could engage in artificial related-party transactions to generate massive tax deductions for years to come, without limit." (Def.'s Cross-Mot. at 34). In turn, Keysight alleges that there is no indication that Congress took issue with the gap period. (*See* Pl.'s Mot. at 25–29; Hr'g Tr., Pl.'s Counsel, 47:15–48:2 ("This has 120 different effective dates . . . . Congress realized there were going to be tradeoffs, some winners, some losers."), ECF No. 50). The Court finds both arguments speculative.

final rule. *See* 84 Fed. Reg. at 29299 (citing H.R. Rep. No. 115-466, at 645 (2017) ("The conferees intended that non-economic transactions intended to affect tax attributes of CFCs and their U.S. shareholders (including amounts of tested income and tested loss, tested foreign income taxes, net deemed tangible income return, and QBAI) to minimize tax under this provision be disregarded."). Keysight and the United States both use this citation, but for different purposes. (*Compare* Def.'s Cross-Mot. at 35–36 (arguing that this language demonstrates "Congress's general concern about non-economic transactions affecting tax attributes of CFCs" which should apply to gap period tax planning for fiscal-year CFCs), *with* Pl.'s Resp. at 29 (arguing that at most, this language shows "that Congress had some interest in curbing abusive transactions—and Congress gave effect to that interest by enacting an anti-abuse provision in Section 951A *only* with respect to QBAI.")). The Court agrees with Keysight—if Congress had been as concerned as the United States posits, it would not have limited the Secretary's authority to promulgate regulations to QBAI. The Court will not interpret the legislative intent more broadly than the statutory language reasonably supports.

*D. Skidmore Deference*

The Court finds no firm statutory footing for the promulgation of the Regulation. Nevertheless, the Court is loath to omit its analysis of Keysight's argument that the Regulation contradicts the promulgating statute, (*see* Pl.'s Mot. at 13–25), particularly given the marginal latitude given to agency interpretation under *Skidmore*. *See Loper Bright*, 603 U.S. at 394 (citing *Skidmore*, 323 U.S. at 140).[7] According to *Skidmore*, the Court can look to the Secretary's interpretation of Section 951A for guidance, particularly when that interpretation is thorough, reasonable, consistent, and persuasive. 323 U.S. at 140. The parties' arguments about the validity of the Secretary's interpretation of the term "properly allocable" provide a lens with which to evaluate the weight of the Secretary's interpretation under *Skidmore*.

The operative language in Section 951A(c)(2)(A)(ii) is: "properly allocable to such gross income under rules similar to the rules of section 954(b)(5)[.]" Section 954(b)(5) does not define a "properly allocable" deduction and limits the Secretary's authority to prescribe regulations specifically to foreign base company income, as discussed above. The Regulation requires taxpayers to allocate deductions attributable to "disqualified basis" to a category of income called "residual CFC gross income[,]" which is defined as "gross income other than gross tested income, gross income taken into account in determining subpart F income, or gross income that is effectively connected, or treated as effectively connected, with the conduct of a trade or business in the United States[.]" Treas. Reg. §§ 1.951A-2(c)(5)(i)–(ii), (iii)(B). The United States argues both that the term "properly allocable" is ambiguous, giving the Secretary the authority to define the term how it wishes *and* that the language set forth in the Regulation falls under the

---

[7] The Court will not, however, reach Keysight's final argument on whether the Regulation is a logical outgrowth of the proposed rule, (*see* Pl.'s Mot. at 36–40), because a finding either way would not change the Court's conclusion that the Regulation is invalid.

umbrella of "properly allocable." (Def.'s Cross-Mot. at 24 ("[T]he meaning of properly allocable is far from settled." (cleaned up))).[8]

The Court disagrees. The premise that the Secretary is allowed to read ambiguity into the Tax Code and then resolve the ambiguity without constraint is antithetical to the very core of *Loper Bright.* It confers unfettered discretion to administrative agencies. Nor did the Treasury Department rely on 951A(c)(2)(A)(ii) in promulgating the regulation. *See* 83 Fed. Reg. at 51077 (proposed rule citing Section 951A(d)(4)); 84 Fed. Reg. at 29298–99 (final rule citing Section 7805(a)). Whether the language set forth in the Regulation is reasonably read under the umbrella of "properly allocable" is a separate question. The term "properly allocable" appears throughout the Tax Code but is not defined. *See e.g.*, I.R.C. § 1411(c)(1)(B) ("[T]he deductions allowed by this subtitle which are properly allocable to such gross income or net gain."); I.R.C. § 199A(b)(4)(B) ("Such term shall not include any amount which is not properly allocable to qualified business income . . . ."); (*see also* Hr'g Tr., 7:14–10:6 (neither party able to direct the Court to a statutory definition of the term)). Recently, the Tax Court in *Savage v. Commissioner of Internal Revenue* analyzed the definition of "properly allocable" in the context of Section 199A.[9] 165 T.C. 54, 60 (2025). The court there noted that it "must discern its ordinary meaning when [the] section . . . was adopted." *Id.* It determined that "the ordinary meaning of the phrase 'properly allocable' refers to something that may be designated to go with something else and fits appropriately or correctly (permissibly, one might say) with it." *Id.* (citing *The American Heritage Dictionary* (5th ed. 2018, 2011) (for the definitions of the terms "proper," "allocable," and "allocate") and *Black's Law Dictionary* (10th ed. 2014) (for the definition of "allocable[.]")). The Tax Court's analysis is illuminative.

Section 951A was enacted on December 22, 2017. According to Keysight, the rule of Section 954(b)(5) at the time was the factual relationship test. (Pl.'s Mot. at 13–15). The Treasury implemented a corresponding regulation, Section 1.954-1(c)(1)(i)(B), which states that the deduction is properly allocable if it is allocable according to "sections 861, 864, and 904(d)." (Pl.'s Mot. at 14–15). Sections 861(b) and 904(d) mention "properly allocable" in passing, but Section 864 does not. *Compare* I.R.C. § 861(b) ("properly apportioned or allocated thereto") *with* I.R.C. § 864 (references "allocable" but omits "properly") *and* I.R.C. § 904(d)(3)(C) ("Any interest, rent, or royalty which is received or accrued from a [CFC] in which the taxpayer is a United States shareholder shall be treated as passive category income to the extent it is properly

---

[8] In support of this argument, the United States cites multiple pre-*Loper Bright* cases that find the term "properly allocable" to be ambiguous. (*See* Def.'s Cross-Mot. at 24 (citing *Allen v. United States*, 173 F.3d 533, 535–36 (4th Cir. 1999); *Redlark v. Comm'r*, 141 F.3d 936, 939–40 (9th Cir. 1998); *Miller v. United States*, 65 F.3d 687, 690 (8th Cir. 1995); *Robinson v. Comm'r*, 119 T.C. 44, 49 (2002))). The United States argues that while these cases are post-*Chevron*, "they are still subject to statutory *stare decisis*." (*Id.* (citing *Loper Bright*, 603 U.S. 412)). None are binding here.

[9] Neither party cites *Savage v. Comm'r of Internal Revenue*, 165 T.C. 54 (2025), in their briefing or oral argument. (*See* Pl.'s Mot.; Def.'s Cross-Mot.; Hr'g Tr.).

allocable (under regulations prescribed by the Secretary) to passive category income of the [CFC].").[10] Section 861(b) states:

> From the items of gross income specified in subsection (a) as being income from sources within the United States there shall be deducted the expenses, losses, and other deductions *properly apportioned or allocated* thereto and a ratable part of any expenses, losses, or other deductions which cannot definitely be allocated to some item or class of gross income.

The companion Treasury Regulation 1.861-8 states that "[a]llocations and apportionments are made on the basis of the factual relationship of deductions to gross income." Treas. Reg. § 1.861-8(a)(2); *see also* § 1.861-8(b)(2) ("A deduction shall be considered definitely related to a class of gross income and therefore allocable to such class if it is incurred as a result of, or incident to, an activity or in connection with property from which such a class of gross income is derived."). The companion regulation to I.R.C. § 904(d) leaves the Court no better off on its journey to divining the true meaning of properly allocable—it does not mention the factual relationship test, and uses the phrase "properly allocable" sporadically throughout, in reference to passive income only. *See* Treas. Reg. § 1.904–5.

The United States contends that "properly allocable" cannot exclusively mean "factually related." (Def.'s Cross-Mot. at 28–30 (citing the "cream-skimming rule" as an example of Congress viewing an interest expense as "properly allocated" even though it was not based on a factual relationship.)). The Court agrees that "properly allocable" does not *exclusively* mean "factually related[,]" but rather the definition is contextual. *See Savage*, 165 T.C. at 60. Here, Keysight has demonstrated a clear thread of legislative intent that supports a definition of "properly allocable" more akin to the factual relationship test. This undermines what little authority remained for the Secretary to promulgate the Regulation. While the Court has taken the Treasury's "informed judgment" into account, it finds its reasoning and consistency lacking. *See Skidmore*, 323 U.S. at 140. Under *Skidmore*, an agency interpretation earns deference only to the extent it has the power to persuade—this one does not. *Id.*

## III. Conclusion

In sum, the Court finds that the Treasury lacked the authority to promulgate Treasury Regulation § 1.951A-2(c)(5). The Court is not persuaded by the United States' arguments nor the Secretary's interpretation of the promulgating statutes. The Court agrees that Section 7805(a) grants the Secretary broad authority to prescribe regulations, but that grant alone is insufficient to

---

[10] Though I.R.C. § 904(d)(3)(C) does include language specifically directing the Secretary to prescribe regulations under the umbrella of properly allocable, the United States does not raise this argument. The Court also does not consider this section relevant to its analysis above regarding the Treasury's lack of authority to promulgate the Regulation and agrees with Keysight that sections 864 and 904(d) do little to inform the Court's examination. (*See* Pls.' Mot. at 5–6 ("Sections 864 and 904(d) are not relevant here; they provide special rules for tax-exempt assets and passive income, neither of which is at issue.")).

sustain the regulation at issue. To that end, the Court's review of the Code has revealed no specific authority—either express or implied—to buttress Section 7805(a). Furthermore, the Treasury's interpretation of "properly allocable" commands no persuasive weight under *Skidmore*. To allow the Secretary to define terms it deems ambiguous, untethered to congressional grants of authority or the underlying statutory context, is precisely the kind of agency overreach *Loper Bright* was designed to foreclose. Therefore, the United States' Cross-Motion for Summary Judgment is **DENIED**, (ECF No. 40), and the Plaintiff's Partial Motion for Summary Judgment is **GRANTED**, (ECF No. 34).

**IT IS SO ORDERED.**

s/ David A. Tapp
DAVID A. TAPP, Judge